761 A.2d 1167

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**James Lincoln STRONG, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 29, 1999.

Decided Nov. 29, 2000.

458

Billy Nolas, Michael Wiseman, Kathy Swedlow, Defender Ass'n of Pa., for James L. Strong.

Andrew D. Bigda, Dist. Attorney's Office, for the Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

CAPPY, Justice.

This is a direct appeal from the order of the trial court denying appellant's petition pursuant to the Post Conviction Relief Act (Hereinafter "the PCRA"). 42 Pa.C.S. § 9546(d). (Suspended August 11, 1997, reinstating subsection (d) from the 1988 Act). Appellant alleges that he is entitled to relief under the PCRA, as his conviction resulted from a constitu-

tional violation of due process in contravention of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). 42 Pa.C.S. § 9543(2)(i). As for the following reasons we find appellant is entitled to relief, we reverse the order of the trial court.[1]

Our resolution of this case requires that we set forth a brief synopsis of the facts that led to appellant's conviction. On August 18, 1983, John Henry Strock was driving a white Ford Grenada along Route 81 in Green Castle, Pennsylvania. Mr. Strock stopped the car on the side of the road and offered a ride to two hitchhikers, James Strong, the appellant herein, and James Alexander. According to the trial testimony of James Alexander, Alexander sat in the front seat and appellant sat in the backseat. (Trial Transcript, hereinafter "T.T." p. 1224). Alexander testified that he promptly fell asleep. (T.T. p. 1225).

When Alexander woke, he observed appellant produce a .20 gauge sawed-off shotgun and rest it upon Mr. Strock's shoulder. (T.T. p. 1225). Appellant directed Mr. Strock to pull the car to the side of the road and exchange seats with Alexander, so that Alexander could drive the car. (T.T. p. 1226). After driving for some time, Alexander pulled the car to the side of the road along an isolated stretch of interstate 81. (T.T. p. 1227). Alexander walked into the woods a few steps in order to relieve himself. When Alexander returned to the car, appellant and Mr. Strock were not present. Alexander then heard a gunshot. Approaching the sound of the gunshot, Alexander saw that Mr. Strock had been shot and his body had fallen into a gully. Appellant was holding the shotgun. (T.T. p. 1232). Alexander asked appellant why he had shot Mr. Strock. Appellant replied that he was tired of leaving witnesses behind. (T.T. p. 1232). Appellant directed Alexander to go through Mr. Strock's pockets. (T.T. p. 1234). Alexander complied, handing the items to appellant. Appellant then directed Alexander to shoot Mr. Strock. Alexander

---

1. As we find the *Brady* issue dispositive we do not review appellant's other claims of error.

refused and began walking back to the car when he heard another gunshot. (T.T. p. 1236).

Alexander and appellant got into the Ford Grenada and continued their journey. (T.T. p. 1237). Appellant and Alexander ultimately abandoned Mr. Strock's Grenada when it ran out of gas. (T.T. p. 1240). Appellant and Alexander continued hitchhiking until they were apprehended in Pottsdam, New York. At the time of the arrest, the officers discovered a .20 gauge sawed-off shotgun. (T.T. p. 1252). While in the custody of the New York police, Alexander agreed to cooperate with authorities and assist them in locating Mr. Strock's body. In furtherance of this objective, Alexander waived extradition from New York to Pennsylvania and it was agreed that the authorities would bring no charges against him in the State of New York. (T.T. p. 1253). Upon returning to Pennsylvania, Alexander assisted the Pennsylvania State Police in locating the body.

Alexander ultimately testified for the Commonwealth at appellant's trial. Prior to trial, appellant had requested any evidence pertaining to an agreement between Alexander and the Commonwealth. The assistant district attorneys prosecuting the case assured appellant that no deal had been made in exchange for Alexander's testimony. Alexander denied that his testimony against appellant was in exchange for favorable treatment by the Commonwealth, although Alexander was also facing trial on charges of murder and kidnapping arising from the same incident.[2] (T.T. p. 1303). Subsequent to appellant's trial, Alexander entered a plea of guilty on the charges of murder and kidnapping in exchange for a sentence of 40 months' of incarceration. (H.T. p. 33). Appellant was convicted of first-degree murder and sentenced to death on October 30, 1984. The judgment of sentence was affirmed in *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990).

---

**2.** The Commonwealth dropped the charge of conspiracy against Alexander prior to appellant's trial. Post Conviction Hearing Transcript (hereinafter "H.T." p. 378).

■ In 1995 appellant filed a *pro se* petition seeking post-conviction relief. Counsel was appointed to assist appellant and an amended petition was filed. Evidentiary hearings were held on April 7th and 8th, and May 8th, 1997. On June 30, 1998 the lower court denied the petition for PCRA relief. This direct appeal followed.[3]

In preparation for the post-conviction evidentiary hearing scheduled for April 7, 1997, appellant's counsel requested copies of all relevant documents contained in the prosecution's file. On April 3, 1997, several letters were faxed to counsel which revealed that Alexander's public defender and the District Attorney of Luzerne County had been discussing an agreement with Alexander prior to appellant's trial. This was the first time this information was made available to appellant. Appellant alleged at the post-conviction hearing that in failing to reveal this information, which he specifically requested prior to trial, the prosecution had deprived him of a fair trial in accordance with the dictates of *Brady*. During the course of the evidentiary hearing, testimony was elicited regarding these letters and any possible deal between Alexander and the Commonwealth impacting upon Alexander's credibility at appellant's trial. At the conclusion of the testimony, the trial court determined that there was no actual deal struck between Alexander and the Commonwealth; therefore, there was no material evidence that had been withheld from appellant and thus no *Brady* violation.

■ Appellant asserts that the trial court erred in its determination that *Brady* had not been violated. To obtain relief on this claim pursuant to the PCRA, appellant must establish that the constitutional violation at issue so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S.

3. In proceedings under the PCRA, the scope of review of an appellate court is limited by the parameters of the act. 42 Pa.C.S. § 9541 *et seq.* Since most PCRA appeals involve, as in this case, issues raising mixed questions of fact and law, our standard of review is whether the findings of the PCRA court are supported by the record and free of legal error. *See Commonwealth v. Allen,* 557 Pa. 135, 732 A.2d 582, 586 (1999); 42 Pa.C.S. § 9543.

462

§ 9543(2)(i); *see Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326 (1999). In assessing appellant's right to relief, we must determine whether a *Brady* violation occurred.[4]

In *Brady*, the United States Supreme Court declared that due process is offended when the prosecution withholds evidence favorable to the accused. *Id.* at 87, 83 S.Ct. 1194. Brady and a co-defendant, Boblit, were tried and convicted of first-degree murder in separate trials. Brady was tried first, and testified on his own behalf, naming Boblit as the actual killer. Prior to trial Brady had requested Boblit's extrajudicial statements. The prosecution turned over several statements, but withheld one statement wherein Boblit admitted that he committed the actual killing. The United States Supreme Court found the action of the prosecutor in withholding Boblit's statement violative of Brady's right to due process. The *Brady* decision extended the principle of *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), which prohibits the prosecution from obtaining a conviction through deliberate deception. The *Brady* court established the obligation of the prosecution to respond affirmatively to a request for production of exculpatory evidence with all evidence material to the guilt or punishment of the accused.[5] Where evidence material to the guilt or punishment of the accused is withheld, irrespective of the good or bad faith of the prosecutor, a violation of due process has occurred. *Brady,* at 87, 83 S.Ct. 1194.

Exculpatory evidence favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant. Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3

4. Whether or not a *Brady* violation occurred must be determined in accordance with the status of the law at the time of appellant's trial in 1984.

5. The rule of *Brady* has been extended to require the prosecution to disclose exculpatory information material to the guilt or punishment of an accused even in the absence of a specific request. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992).

L.Ed.2d 1217 (1959). As the court in *Napue* sagely observed: "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend." *Id.* at 269, 79 S.Ct. 1173. Any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility. *United States v. Giglio*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Appellant alleges a *Brady* violation occurred in this case because despite appellant's requests, the Commonwealth denied the existence of any arrangement with Alexander relevant to Alexander's testimony against appellant. The trial court found no violation as the evidence failed to reveal the existence of a completed deal between the Commonwealth and Alexander prior to appellant's trial. However, *Brady* does not require a signed contract between the prosecution and its witnesses.

■ In *Giglio*, the government needed the testimony of Taliento, a bank teller, in order to convict Giglio in a scheme involving forged money orders. The government attorney who presented the case to the grand jury "promised" Taliento that he would not be prosecuted for his part in the scheme. Taliento testified against Giglio before the grand jury and at trial. Although Taliento was listed on Giglio's indictment as a co-conspirator, Taliento was not indicted. At trial Taliento did not reveal the promise. A different government attorney tried the case, and in his closing argument stated that no promises had been made regarding Taliento's testimony. The trial attorney had not been informed of the promise made by

the attorney who prepared the case before the grand jury. The matter of Taliento's promise was not discovered until after Giglio had been convicted. The United States Supreme Court found that it was irrelevant which attorney made the promise and that the first attorney failed to reveal the promise to the second attorney, because for *Brady* purposes, the prosecutor's office is one entity. *Id.* at 154, 92 S.Ct. 763. The critical point for the Court in *Giglio* was that Taliento was a crucial witness and thus, his credibility was an important issue for the jury in resolving Giglio's culpability. Any evidence of an understanding or promise regarding Taliento's testimony was relevant and the jury was entitled to that knowledge. As *Giglio* made clear, due process requires that any potential understanding between the prosecution and a witness be revealed to the jury.

In reviewing appellant's allegation of a *Brady* violation, we begin with the letters that were turned over four days prior to the evidentiary hearing. (Appellant's exhibit A). A condensed chronological summary of the four letters is as follows. On December 6, 1983, Alexander's attorney, Bruce Miller, wrote to the District Attorney of Luzerne County, Robert J. Gillespie, Jr. In that letter, Miller referenced an earlier conversation with Gillespie regarding a deal for Alexander to receive a two year jail term upon a plea to the pending murder charges. Miller wrote that in light of Alexander's prior record and the sentencing guidelines, the court would probably reject two years. But Miller agreed that three years was appropriate "in view of the cooperation Mr. Alexander has given up to this point and will give to the Commonwealth in the future." The second letter is dated December 12, 1983, and was written by Robert J. Gillespie, Jr. to John Mauro, the State Police Trooper in charge of the investigation of Mr. Strock's murder. That letter forwarded the December 6th letter of Mr. Miller and stated "I believe it's time we sit down and firmly discuss our deal with Alexander so that we can go forward." The third letter, dated January 26, 1984, is from Attorney Miller to District Attorney Gillespie. In that letter, Miller reported that Alexander had complained of his prison

situations and he sought accommodation for Alexander, "considering the cooperation that Mr. Alexander is offering to the Commonwealth, it does not appear that this request is unreasonable." On January 27, 1984, District Attorney Gillespie responded to Miller's letter with the statement that he had no control over the current placement of Alexander, but that he would forward Miller's letter to the warden.

After the admission of these letters into evidence, several witnesses were called. James Alexander testified that his trial testimony against appellant was in exchange for a deal for minimum jail time on his pending charges of murder and kidnapping. (H.T.15). Alexander could not recall the names of the attorneys involved, but he did recall being advised to state that no deal had been made when he testified at appellant's trial. (H.T.15, 28). Alexander acknowledged that he had completed his jail term and parole prior to coming forward at appellant's evidentiary hearing. (H.T.33).

Appellant's trial counsel, Michael Kostelansky, testified that he was of the belief that the Commonwealth had procured Alexander's testimony by striking a deal favorable to Alexander. (H.T.379).[6] Kostelansky made several attempts to discover a plea agreement, or any arrangement between

---

**6.** Kostelansky testified to receiving a phone call, at the time of appellant's trial, from a confidential source telling him that a deal existed between Alexander and the Commonwealth. (H.T.382). On the strength of this tip, without revealing the source, he renewed the *Brady* request for information about a plea arrangement between Alexander and the Commonwealth. The Commonwealth again denied the existence of any deal. At the evidentiary hearing, the trial court directed Kostelansky to reveal the source of the tip. (H.T.383). Kostelansky named Russell Thomas, an investigator for the Office of the Public Defender of Luzerne County. At the time of appellant's trial, a defense request for appointment of a private investigator was denied, and Mr. Thomas was directed to work as the investigator for appellant, while he was also the investigator for the Public Defender. (H.T.435). The Public Defender represented Alexander. Mr. Thomas testified that he had no recollection of making a call to Kostelansky regarding a deal with Alexander. (H.T.438). At the time of the evidentiary hearing, Thomas was still employed as an investigator for the Public Defender of Luzerne County. In a related argument, appellant alleges that Thomas' simultaneous functioning as investigator for him and Alexander created a conflict of interest detrimental to appellant's case. Given our resolution of this matter we do not address this issue.

Alexander and the Commonwealth. The Commonwealth always denied the existence of any arrangement with Alexander. (H.T.380). Kostelansky had never seen the letters referred to herein prior to the evidentiary hearing. (H.T.389). If he had known of the letters, he stated that he would have used them in cross-examining Alexander, as he believed Alexander's credibility was a critical issue in appellant's trial. (H.T.426–7).

Anthony Lumbis, co-counsel for appellant at trial, recalled having similar suspicions as those of Attorney Kostelansky regarding a deal between Alexander and the Commonwealth. (H.T.679). Attorney Lumbis had never seen the letters at issue until the evidentiary hearing. (H.T.682). He testified that had the letters been known they would have been helpful in supporting evidence of a deal regarding Alexander's testimony. (H.T.703).

Robert J. Gillespie, Jr. testified that he had no recollection of the letters at issue. (H.T.565). However, he did recall discussions with Mr. Miller regarding consideration for Alexander. (H.T.568). Mr. Gillespie was positive that no plea agreement was made, for if one had been arranged it would have been on the record. (H.T.577). Mr. Gillespie elaborated that it was his practice as District Attorney of Luzerne County at the time of appellant's trial to avoid entering into plea agreements until after receiving the cooperation. (H.T. 577). Rather, it was his "normal course to indicate that truthful cooperation would get consideration." (H.T.577). Mr. Gillespie acknowledged that *Brady* concerns factored in to his policy on plea agreements because the jury would have to be apprised of any such agreement. (H.T.578). Mr. Gillespie described the letters at issue as negotiations, not evidence of a deal. (H.T.599). He acknowledged that a fair statement would be that Alexander testified in hopes of getting consideration for himself. (H.T.603).

Attorney Bruce Miller represented Alexander. (H.T.717). Mr. Miller had no recollection of the letters, but upon review he found them indicative of negotiations on behalf of Alexander. (H.T.726). He testified that he would not have told

Alexander to lie about a deal for his testimony. (H.T.743). Attorney Miller admitted the possibility that he may have advised Alexander to testify in hopes of favorable consideration. (H.T.751-2). Attorney Miller also admitted to the possibility that an unwritten agreement may have existed regarding a deal between Alexander and the Commonwealth. (H.T. 756-7).

John Eichorn and Daniel Pillets, the Assistant District Attorneys who prosecuted appellant, testified to no knowledge of the letters. (H.T.793, 815). Both attorneys denied the existence of any deal with Alexander. (H.T.782, 805). Both attorneys testified that if they had known of the letters, *Brady* would require their disclosure. (H.T.795, 814).

We agree with the trial court's finding that the witnesses were credible in stating that there was no deal struck, and that there was no definitive agreement between Alexander and the prosecution. In addition, we concur in the trial court's assessment that Alexander's testimony as to the existence of an agreement lacked credibility. Alexander could not recall the name of his attorney, or of the District Attorney who negotiated an agreement on his behalf, nor could he recall the particulars of the deal. However, we note that the absence of an ironclad contract in exchange for Alexander's testimony is not dispositive. *See Giglio, supra.* Therefore, we do not agree with the trial court's assessment that these factors are determinative of appellant's *Brady* claim.

Even if we disregard Alexander's testimony at the evidentiary hearing, sufficient circumstantial evidence of an understanding between Alexander and the Commonwealth regarding Alexander's testimony at appellant's trial exists. Alexander and appellant had each been indicted on charges of murder, kidnapping and conspiracy. The Commonwealth did not seek a joint trial of the alleged coconspirators, and in fact dropped the conspiracy charge against Alexander prior to appellant's trial. The Commonwealth, as the letters revealed, had offered Alexander a sentence of two years on the charges of murder and kidnapping, pending information on his prior

record. Mr. Miller, upon receipt of the prior record information, indicated a willingness to have Alexander plead guilty in exchange for a sentence of 36 months, rather than 24 months. Ultimately, Alexander pled guilty and received a sentence of 40 months. Unlike the trial court, we do not find this additional 4 months to be a critical departure from the understanding that the parties had been discussing prior to appellant's trial. The fact that the trial prosecutor was unaware of the negotiations between his superior and counsel for Alexander is irrelevant. As the United States Supreme Court has repeated time and again, the good faith or the bad faith of the individual prosecutor is irrelevant in determining whether or not the accused has been afforded a fair trial. *Giglio*, 405 U.S. at 154, 92 S.Ct. 763. Accordingly, we find the record establishes the existence of an understanding between the Commonwealth and Alexander that he would be treated with considerable leniency in exchange for his testimony against appellant. This understanding although not articulated in an ironclad agreement, was sufficient to implicate the due process protections of *Brady.*

Having found that an understanding existed between Alexander and the Commonwealth, which was sufficient to trigger *Brady,* we must next determine if that understanding was material, thus entitling appellant to relief. As stated previously, impeachment evidence is material, and thus subject to obligatory disclosure, if there is a reasonable probability that had it been disclosed the outcome of the proceedings would have been different. *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375; *Agurs,* 427 U.S. at 112–113, 96 S.Ct. 2392; *Commonwealth v. Wallace,* 500 Pa. 270, 455 A.2d 1187, 1192 (1983).

The evidence at appellant's trial established that appellant and Alexander were hitchhiking together. Several witnesses were called who gave rides to the two men. Appellant was seen with Alexander in the victim's car. Appellant and Alexander had in their possession the identification of the victim and certain of his belongings at the time of their arrest. In appellant's luggage, police recovered a .20 gauge sawed off shotgun. Alexander had in his possession a bloodstained

handkerchief. (T.T. 1667). The blood was Type A, the same blood type as Alexander and as Mr. Strock. (T.T. 1678). Testimony of a firearm expert established that the shot pattern of the shotgun recovered at the time of arrest was similar to the shot pattern of the weapon that was used on the victim. (T.T. 1663). The expert conceded that there would be no way to exactly identify the shotgun used to kill Mr. Strock. (T.T. 1664).

This circumstantial evidence places Alexander and the appellant in exactly the same position regarding their culpability for the death of John Strock. The crucial fact that alters this equation is Alexander's testimony. During trial, appellant testified that he was hitchhiking with Alexander from Pennsylvania to New York. (T.T. 1717). Appellant testified that Alexander was the person who brought along the shotgun. (T.T. 1721). However, at some point in their progress along the highways they separated, as it was difficult for two men to get rides together. (T.T. 1735). A day or so later they happened upon each other at a rest stop at which time Alexander had in his possession the items later identified as belonging to the victim. (T.T. 1750).

There are obvious discrepancies between appellant's and Alexander's testimony. Given that James Alexander is the key witness who puts the gun in appellant's hand at the moment of the murder, his credibility was decisive to the jury's finding as to appellant's guilt. Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness. The absence of an ironclad, signed, sealed contract does not conclusively establish that no other information affecting the credibility of the witness exists. *Giglio*, at 155, 92 S.Ct. 763. To the contrary, the fact that there was no binding agreement regarding Alexander's deal in exchange for his testimony, but rather only a contingency dependent upon the Commonwealth's satisfaction with the end result, only strengthens Alexander's motive to testify favorably for the Commonwealth.

*Bagley,* 473 U.S. at 683, 105 S.Ct. 3375.[7]  The facts in this case strongly indicate that Alexander's testimony was in exchange for what he believed would be a beneficial outcome to him. That understanding was material information that appellant's jury should have been informed of when weighing Alexander's credibility.  There is a reasonable probability that had this information been revealed, the outcome of appellant's trial would have been different. *Bagley, supra., Agurs, supra., Giglio, supra., Brady, supra.*

Appellant has established a due process violation as the Commonwealth failed to disclose exculpatory information concerning the credibility of its key witness.  The Commonwealth's failure to comply with *Brady* is a violation of the Fourteenth Amendment of the United States Constitution. As demonstrated above, that violation undermined the truth-determining process so that no reliable adjudication of appellant's guilt or innocence could have taken place.  *Kimball, supra., Wallace, supra.*  Thus, appellant has met the criteria for relief under the PCRA. 42 Pa.C.S. § 9543(2)(i).

Accordingly, this matter is remanded for a new trial.

Jurisdiction is relinquished.

Justice CASTILLE files a concurring opinion joined by Justice NEWMAN.

CASTILLE, Justice, concurring.

Although I agree with the majority that appellant is entitled to a new trial, my reasons for reaching that conclusion are sufficiently narrower and distinct as to warrant a separate opinion.  I also write separately to emphasize the unusual circumstances of this case and to address further the question of whether and when guilty plea negotiations with, or promises to, a cooperating co-defendant that fall short of a formal plea agreement must be disclosed.

7. Only Justice O'Connor joined this portion of Justice Blackmun's opinion.

In finding a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the majority's primary focus is upon a letter sent by co-defendant James Alexander's counsel to the District Attorney of Luzerne County, Robert J. Gillespie, Jr. The majority construes this letter as proof of a guilty plea "understanding" between the Commonwealth and Alexander. The majority derives further support for its belief that the letter proves a specific "understanding" from the fact that the sentence Alexander ultimately received was only four months longer than the sentence his counsel had proposed in the letter. Slip Op. at 10–11. In my view, the majority's overemphasis on the letter is mistaken. The Commonwealth clearly had no obligation under *Brady* to disclose this letter, or the other letters the majority discusses, since the credited testimony below established that the plea negotiations to which they refer, occurring nearly a year before appellant's trial, did not result in any actual plea agreement.

Instead, the due process duty to disclose here arose from the separate fact, unequivocally testified to by former District Attorney Gillespie at the PCRA hearing, that although no specific plea agreement was ever reached, Gillespie nevertheless had advised Alexander's attorney that Alexander would receive consideration and be treated fairly if he cooperated (N.T. PCRA at 576–83). When Alexander squarely and repeatedly insisted at trial that no "promises," "agreements," or "arrangements" for "favorable treatment" had been made in connection with the prosecution pending against him (T.T. 1253, 1303–04), the Commonwealth was under a duty to disclose the promise of consideration and fair treatment made by Gillespie. *Giglio v. United States,* 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (United States Attorney's office obliged to disclose promise of non-prosecution in exchange for cooperation made by assistant United States attorney at grand jury stage; "evidence of any understanding or agreement as to a future prosecution" is relevant to credibility).[1]

**1.** Although *Giglio* involved a federal prosecution, it was based upon the due process clause and the *Brady* line of cases and thus is binding on state prosecutions.

Instead of doing so, the trial prosecutor, who apparently was unaware of the previous representation made by his superior, denied the existence of any arrangement (T.T. 1201, 1499). Under *Giglio*, it does not matter that the trial prosecutor was unaware of the prior promise made by his superior:

> [W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.

*Giglio*, 405 U.S. at 154, 92 S.Ct. 763. The failure to disclose the District Attorney's promise of consideration in the face of Alexander's denial at trial of any arrangement implicates *Brady/Giglio*. The unconsummated guilty plea correspondence is of secondary importance at best; *i.e.*, it is relevant only insofar as it suggests what it was that Alexander and his counsel might have understood the general promise of consideration/fair treatment to entail.

In its *Brady* analysis, the majority overstates the content and importance of the guilty plea correspondence, while it fails to fully appreciate the significance of the District Attorney's testimony. Like appellant, Alexander was charged with first degree murder and kidnapping. Alexander, however, cooperated with authorities, beginning with his assisting police in locating the victim's body; indeed, his cooperation predated any involvement of the District Attorney's office. Before appellant was brought to trial, District Attorney Gillespie and Alexander's counsel engaged in plea negotiations that were memorialized to some extent in a December 6, 1983, letter from Alexander's counsel to Gillespie. The majority characterizes this letter as referring to "an earlier conversation with Gillespie regarding a deal for Alexander to receive a two year jail term upon a plea to the pending murder charges." Majority op. 563 Pa. at 464, 761 A.2d at 1172. Later on, the majority goes so far as to state that the letter revealed that the Commonwealth "had offered Alexander a sentence of two years on the charges of murder and kidnapping, pending

information on his prior record." *Id.* 563 Pa. at 467–68, 761 A.2d at 1174. These characterizations are inaccurate.

In fact, the December 6th letter did not specify whether it was referring to the murder charge or the kidnapping charge,[2] nor did it make **any** reference to a "deal" or a sentencing "offer." Instead, Alexander's counsel stated in the letter that he had received a copy of Alexander's prior record and then discussed how that record might affect a calculation of the sentencing guidelines—again, without specifying a particular offense. Counsel noted that, even if Alexander's prior record score was "zero," the mitigated minimum sentence under the guidelines would be thirty-six months. Counsel then stated that, "[p]revious to our discussion concerning the sentencing guidelines, you had indicated to me a sentence of two years." Counsel further noted that he understood that the guidelines "could present a problem," but felt that a sentence in excess of 36 months would be inappropriate in light of Alexander's cooperation.

The majority's characterization of the letter as referring to a "deal" "offered" by the Commonwealth for a two year sentence also ignores the PCRA testimony of Gillespie, who stated that the reference to "two years" could just have easily concerned a mere proposal by the defense, or "I could have said that the last time we had cooperation somebody received two years" (N.T. PCRA at 592). In addition, there is no evidence that Gillespie wrote back to Alexander's counsel on the matter, although Gillespie did forward a copy of the letter to the state trooper spearheading the murder investigation, along with a notation that it was time to "firmly discuss our deal with Alexander."

Conflicting evidence was presented at the PCRA hearing concerning whether these "negotiations" resulted in an actual plea agreement with Alexander before appellant's trial ten

---

**2.** Since the letter spoke of a sentencing range short of life imprisonment, if it was referring to the murder charge, it had to be contemplating either third degree murder or a manslaughter charge. Notably, since both third degree murder and kidnapping are graded as felonies of the first degree, 18 Pa.C.S. §§ 2502(c), 2901(b), they would result in the same sentencing guideline ranges.

months later. Alexander, who by the time of the PCRA hearing had served his entire sentence, testified, as co-felons so often do at that point, in favor of appellant. Alexander insisted that such a deal had been reached. Specifically, he claimed that he was promised that he would receive a "minimum sentence" in exchange for his testimony. Alexander further claimed that he was told by "somebody" in the district attorney's office, whom he could not identify, to deny that the deal existed if he was asked about it at trial because "it could mess everything up." Alexander claimed that he had deliberately perjured himself at trial when he stated that he was not testifying pursuant to an agreement (N.T. PCRA at 14–16, 29).

Alexander's account that he testified pursuant to a plea arrangement and perjured himself at trial was squarely contradicted by every other PCRA witness who would have been in a position to know about such an arrangement—*i.e.*, his counsel (who would have to have actively suborned the perjury if Alexander was telling the truth), Gillespie, and the two assistant district attorneys who actually prosecuted appellant. That evidence established that there were plea negotiations, but no concrete plea agreement, and Alexander was never told to lie at trial. The testimonial conflict was resolved by the PCRA court, which had an opportunity to observe the demeanor of the relevant witnesses, in favor of the Commonwealth, with the court specifically discrediting Alexander's testimony. PCRA slip op. at 20. That credibility finding, of course, is binding on this Court. *Commonwealth v. Nelson,* 484 Pa. 11, 14, 398 A.2d 636, 637 (1979) ("It is up to the trial court to judge the credibility of [recantation testimony]"); *accord Commonwealth v. Henry,* 550 Pa. 346, 706 A.2d 313 (1997).

The fact that no plea agreement was reached, however, does not end the *Brady/Giglio* inquiry, for the United States Supreme Court has recognized that promises or understandings as to the potential future prosecution of a co-defendant that fall short of a finalized plea bargain may also sufficiently implicate the witness's credibility that due process requires disclosure. The constitutional underpinning for the require-

ment that such exculpatory evidence be disclosed was traced by the *Giglio* Court as follows:

> As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791(1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id.,* at 269, 79 S.Ct., at 1177. Thereafter *Brady v. Maryland,* 373 U.S. [83,] 87, 83 S.Ct. [1194,] 1197, 10 L.Ed.2d 215 [(1963)], held that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution.' . . . When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra,* at 269, 79 S.Ct., at 1177.

*Giglio,* 405 U.S. at 153–54, 92 S.Ct. 763. Indeed, since *Giglio,* some courts have recognized that an unconsummated agreement can create a greater incentive for a witness to testify in a manner that he perceives to be favorable to the government. *E.g. State of Louisiana v. Lindsey,* 621 So.2d 618 (La.Ct.App. 1993) (promise of favorable consideration in exchange for testimony deemed credible gave witness "a direct personal stake" in defendant's conviction; "The fact that a specific reward was not guaranteed through a promise or a consummated plea agreement, but was expressly contingent on the state's good faith and satisfaction with [the witness's] testimony, served only to strengthen any incentive to testify falsely in order to secure [the defendant's] conviction."). *Cf. United States v. Bagley,* 473 U.S. 667, 683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.) ("The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's

satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction").[3]

Here, the plea negotiations with Alexander did not break down or terminate.[4] Rather, they were deliberately left open in part because District Attorney Gillespie, as a matter of policy, sought to avoid plea agreements with cooperating co-defendants until after the cooperation had occurred and could be assessed for truthfulness. There is nothing wrong with such a policy which, as Gillespie testified, he deemed a practical necessity since, "you always have the possibility of getting burned into a plea agreement and then having the defendant not cooperate" (N.T. PCRA at 577). An additional legitimate concern weighing in favor of not committing to plea agreements before cooperation was the recognition that such agreements were relevant to bias/credibility and thus could be used to undermine the witness's testimony (id. at 578, 589–90).

Gillespie further testified, however, and it this testimony that implicates Brady/Giglio, that it would have been his normal practice to indicate to Alexander's counsel that Alexander's truthful cooperation "would get consideration" and that, in point of fact, "I can tell you that I am sure we told [Alexander's counsel] that his client would be treated fairly if he cooperated" (id. at 577, 582). Gillespie elaborated that what fair treatment would entail was a "case by case" matter, i.e., the Commonwealth would "look at the circumstances of, one, his cooperation, what it meant to the trial of the case; two, look at his participation in the crime; and three, then look and see what justice demanded. And I can tell you that takes many forms" (id. at 576, 582–83). Finally, Gillespie noted that his county was comparatively small, that he had a relationship of "mutual respect and trust" with most defense counsel, including Alexander's lawyer, and thus he expected

3. This portion of Justice Blackmun's opinion in Bagley was joined only by Justice O'Connor.

4. Alexander's counsel testified that, if plea negotiations had broken off, he would have advised Alexander to cease cooperating with the Commonwealth (N.T. PCRA at 727). Alexander, of course, did continue to cooperate and testified against Appellant.

that Alexander's counsel would accept that the Commonwealth would honor its word (*id.* at 573–74, 577, 579–80).

Gillespie's promise to Alexander's counsel, rather than the plea negotiation letter, implicates due process. It was that promise that had to be disclosed once Alexander flatly denied at trial that any "promises," "agreements," or "arrangements" for "favorable treatment" had been made in connection with his open case. The plea negotiation letter, though important, was derivative. It suggests what Alexander had reason to believe would be the "consideration" he would receive for his cooperation. Alexander, like appellant, was facing charges of first degree murder; if convicted, he faced a sentence of life imprisonment at best. The fact that the Commonwealth was willing to discuss a plea agreement that would result in a significantly lesser term of years and remove the prospect of life imprisonment was significant in and of itself, irrespective of the precise sentence Alexander ultimately would receive. Alexander's credibility and potential interest and bias were a central issue at trial. Particularly in light of the nature of the negotiations that preceded it, Gillespie's promise provided Alexander with a powerful incentive to testify favorably for the Commonwealth and unquestionably was a matter that was relevant to attack Alexander's credibility. Such impeachment evidence, no less than exculpatory evidence, is covered by the *Brady* rule. *See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375.

The remaining question is whether the undisclosed promise was material for *Brady* purposes and whether there is a "reasonable probability" that the outcome of the trial would have been different if Alexander had been subject to cross-examination on the point. *Id.* at 677, 105 S.Ct. 3375; *see also id.* at 685, 105 S.Ct. 3375 (White, J., concurring).[5] As to this point, I agree with the majority's analysis. Alexander was not just a key witness against appellant, but an indispensable one. This trial, moreover, squarely pitted his credibility against that of appellant, who also testified. Cross-examination of a

---

**5.** *Bagley* was a majority opinion as to the propositions cited in the text above but was a plurality opinion as to its application of the *Brady* materiality standard to the facts of that case.

cooperating co-defendant like Alexander, whose testimony is obviously motivated to some degree by self-interest, can be effective even where the witness has received no "deal" or "promise" in exchange for his testimony. Here, however, there was an existing promise, although a vague promise, and Alexander's true status was not disclosed to appellant. Moreover, appellant's efforts to impeach Alexander on grounds of expected favorable treatment from the Commonwealth were stymied when that claim was met by a denial not only from the witness but also from the trial prosecutor, an officer of the court. The jury was thus erroneously led to believe that Alexander had no personal stake in the trial's outcome beyond a vague hope for leniency. Suggesting to the jury that a witness's testimony was influenced by a unilateral hope for mercy is far less effective than concrete evidence that the witness was given an actual assurance of fair treatment and consideration in a case where **any** such consideration meant the prospect of avoiding a life sentence. Given the importance of Alexander's testimony, and the strength of the undisclosed impeachment, I agree that a new trial is warranted.

Not all negotiations between the prosecution and a cooperating co-defendant witness falling short of an actual agreement must be disclosed to the defense. It is only where some actual promise of favorable treatment in the witness's own prosecution has been made, and that fact becomes material at trial, that disclosure is required. Because I am satisfied that those contingencies exist here, I concur in the mandate of a new trial.

Justice NEWMAN joins this concurring opinion.