**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Franklin Luther JACKSON, Appellant.**

Superior Court of Pennsylvania.

Submitted March 10, 2008.

Filed April 30, 2008.

Mark S. Keenheel, Philadelphia, for appellant.

Joshua E. Neiderhiser, Asst. Dist. Atty., for Com., appellee.

BEFORE: STEVENS, PANELLA, and HUDOCK, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of York County following Appellant's conviction by a jury on the charge of third degree murder.[1] Appellant contends the Commonwealth committed a *Brady* violation by failing to disclose during Appellant's trial that the Commonwealth was going to dismiss all charges against co-conspirator Shannon Stuart in exchange for Stuart's testimony against Appellant. We affirm.

¶ 2 The relevant facts and procedural history are as follows:

Members of [Appellant's] group got into a verbal dispute with the members of another group. The next day someone fired a shotgun through the front door of the residence where [Appellant] and co-defendant lived on South Queen Street. [Appellant] suspected that the members of the other group with whom they had a dispute were the perpetrators of this shooting.

The following morning, co-defendant Troy Gellespie went out looking for the

---

1. 18 Pa.C.S.A. § 2502(c).

members of the other group. Gellispie located a member of the other group at a residence located several blocks away on South Queen Street. Gellispie called back to the residence he shared with [Appellant] to arrange for [Appellant] and others who were present at [Appellant's] home to come to this location with guns to get revenge for the previous night's shooting through their door. [Appellant] directed the other occupants of the home to obtain their weapons, and proceeded to drive them to a location back in an alley half a block from where co-defendant Gellispie had indicated the other group would be. [Appellant] gave guns to the other occupants of the vehicle, and directed them to go down the alley to meet with Gellispie.

[Appellant and his co-defendant] believed that an individual called M–Dot was the one who fired the shotgun through their door. M–Dot was not present with the other group which had been located by co-defendant.... However, his brother, Deo Garcia, was seated on the front porch of a residence on South Queen Street. Also present was his sister's husband, who everyone agrees had no involvement in the previous conflicts between the two groups.

When the individuals who were brought to the scene by [Appellant] met co-defendant ..., they began shooting at Deo Garcia. Deo Garcia pulled out his own gun and returned the fire. Chris Butler, Deo's sister's husband, attempted to duck behind a parked vehicle. Unfortunately, he was hit right between the eyes by one of the shots and died. The shooters then fled back to the vehicle were [Appellant] was waiting for them, and [Appellant] drove them back to his residence. On the way back, one of [Appellant's] group discarded his weapon. When [Appellant and his co-defendant] arrived back at their residence[,] the shooters attempted to conceal their involvement in the shooting by washing their persons, wiping off weapons, etc. Members of the group went back and picked up the weapon which had been discarded and returned to the house where efforts were made to remove any indication that [the gun] was [used] in the shooting.

The trial was somewhat complicated by the fact that many of the Commonwealth witnesses gave testimony that was contradictory to their previous statements to the police. The Commonwealth called two individuals who happened to be present at the time of the shooting because they were attempting to buy drugs from Deo Garcia. Because their testimony differed from their earlier statements[,] they did not [aid] the Commonwealth's case. The Commonwealth also called at least one witness who was probably one of the individuals who was in [Appellant's] car and took part in the shooting. However, the Commonwealth could not prove that at the time of his testimony, and his actual testimony was again detrimental to the Commonwealth's case.

The Commonwealth did have the testimony of Desiree Garcia, the wife of the murder victim, Chris Butler. However, her initial report of the crime attempted to conceal her brother, Deo Garcia's, role in the shooting. Therefore, she described another individual to the police. The police subsequently found the individual she described, but were able to establish that [the] individual was in jail in Philadelphia at the time of the shooting.... Therefore, Desiree Garcia's testimony was flawed by this misdirection of the truth.

Fortunately for the Commonwealth, two witnesses that the Commonwealth originally did not intend to call saved their case. The Commonwealth had not intended to call Deo Garcia because of his extensive criminal record, his probable involvement in the shooting into the co-defendants' residence the night before, and his lack of cooperation with the police investigation. However, when the Commonwealth's other witnesses "went south," the Commonwealth was essentially forced to call Deo Garcia. To the Commonwealth's surprise, he turned out to be an excellent witness, particularly at describing what happened at the scene of the crime when the shooting was [occurring.] However, even Deo Garcia didn't really involve [Appellant] in the crime since he was not one of the shooters, but had instead remained at a location a half block away where he was not visible to the victims of the shooting.

Shannon Stuart was also charged with Homicide in this case. However, he had fled to Georgia prior to the charges being filed, and therefore, [he] had never been arrested. Fortunately for the Commonwealth, he was picked up in Georgia on the first day of trial. The Commonwealth sent people to interview him in Georgia, and he confessed [to] his involvement, agreed to testify for the Commonwealth, waived extradition, and was immediately brought back to Pennsylvania. The court then appointed counsel for Shannon Stuart. Counsel worked out a plea agreement with the District Attorney, whereby the charge of First Degree Murder[, which was lodged] against him was dropped, and he agreed to testify for the Commonwealth.

It is noted that defendants objected to Shannon Stuart's testimony on the basis that they hadn't received notice prior to trial. However, it is obvious the Commonwealth couldn't [have given] the defense notice before trial when the Commonwealth itself didn't know that Stuart would testify prior to trial.

It is noted that the Commonwealth did inform the defense as soon as it became known that Stuart had been arrested and agreed to cooperate. It is further noted that prior to Stuart's testimony defense counsel [was] given the opportunity to review the statement that Stuart had given to the police at the time of his arrest. Therefore, [the trial court ruled] there was no discovery violation as the defense argued.

Stuart then provided the testimony that proved [Appellant's] involvement in the crime. Stuart testified that he was one of the people present at the residence of [Appellant] and [co-defendant] Gellispie when Gellispie called and said that he had located the group that had messed with them. Stuart described [Appellant] as the one who directed the gathering of weapons by the rest of the group and drove them to the alley a half block from where the victim was shot. Stuart also stated that [Appellant] directed the passengers in the car to take the weapons, proceed down the alley to meet up with Gellispie, and do what they came for. Stuart also described how the shooters fled back to [Appellant's] car where he was waiting for them. Stuart further described the efforts made to conceal evidence, which he said was directed by [Appellant].

[The jury convicted Appellant of third degree murder.] Sometime after the trial was over, [on or about April 16, 2007,] the Commonwealth dismissed all charges against Shannon Stuart.

Trial Court Opinion filed 9/17/07 at 1–5.

¶ 3 On April 30, 2007, Appellant was sentenced to an aggregate of twenty years

to forty years in prison. On May 8, 2007, Appellant filed a timely post-sentence motion challenging, *inter alia,* the Commonwealth dismissing the charges against Shannon Stuart subsequent to Appellant's trial. Following a hearing, which was held on June 25, 2007, the trial court denied Appellant's post-sentence motion by order entered on July 19, 2007. This timely appeal followed. On July 25, 2007, the trial court ordered Appellant to file a Pa. R.A.P.1925(b) statement, and Appellant filed a timely petition seeking an extension of time due to the unavailability of the transcripts. The trial court granted Appellant an extension of time, and Appellant filed a Pa.R.A.P.1925(b) statement within fourteen days of receiving the trial transcripts. The trial court filed a responsive Pa.R.A.P.1925(a) opinion.

■ ¶ 4 Appellant contends the Commonwealth committed a *Brady* violation by failing to inform the defense and jury that the Commonwealth was going to dismiss the charges filed against Shannon Stuart in exchange for Stuart's trial testimony against Appellant. Appellant contends that if the jury would have been told the charges against Stuart were going to be dismissed by the Commonwealth there is a reasonable probability that the outcome of Appellant's trial would have been different.

In *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court declared that due process is offended when the prosecution withholds evidence favorable to the accused. Exculpatory evidence favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant: "Exculpatory evidence also includes evidence of an *impeachment* nature that is material to the case against the accused." *Com-*

*monwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1171 (2000). Our Pennsylvania Supreme Court has held that any implication, promise or understanding the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility, and therefore, constitutes *Brady* material. *See Commonwealth v. Champney,* 574 Pa. 435, 449, 832 A.2d 403, 412 (2003).

In *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167 (2000), the defendant, following his conviction of murder, produced evidence of communications between the prosecutor and a witness' attorney, including letters written prior to trial, referring to a negotiated deal. Our Supreme Court held that, regardless of any evidence of bad faith, the due process protections of *Brady* are implicated if there is an understanding of leniency between the Commonwealth and a witness. Therefore, a new trial was ordered because the understanding, even though not ironclad, was not brought to the defendant's attention prior to trial.

*Commonwealth v. Tielsch,* 934 A.2d 81, 87–88 (Pa.Super.2007). *See Commonwealth v. Burkhardt,* 833 A.2d 233, 241 (Pa.Super.2003) (en banc) ("The *Brady* rule has been extended to require the prosecution to disclose exculpatory information material to guilt or punishment of an accused even in the absence of a specific request.... When the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted).

¶ 5 Here, during Appellant's trial, it was established that, after the incident, Stuart

fled to Georgia and he was then charged with first-degree murder. N.T. 3/15/07 at 626. Authorities found Stuart in Georgia on the day Appellant's trial commenced and, two days prior to testifying at Appellant's trial, Stuart waived extradition to Pennsylvania. N.T. 3/15/07 at 625–626. Regarding Stuart's agreement with the Commonwealth in exchange for his testimony, the following exchange occurred between the prosecutor and Stuart at trial:

Q: You agreed or rather were asked to testify in this case?

A: Agreed.

Q: You had an opportunity to talk to your attorney?

A: Yes.

Q: These officers gave you your Miranda rights prior to taking your statement?

A: Yes, they did.

Q: You agreed to waive those rights and tell your version of your involvement in these events?

A: Yes.

Q: What's your understanding of any agreement you have with the Commonwealth of Pennsylvania in exchange for your testimony today?

A: Excuse me?

Q: What do you believe you're getting out of this?

A: Some kind of compensation.

Q: Well, isn't it true that I told you, in front of your attorney, that you [*sic* ] we were going to take murder in the first degree off the table and other than that bring your consideration to some Court's attention at a later date?

A: Yes.

N.T. 3/15/07 626–627.

¶ 6 Moreover, on cross-examination, the following exchange occurred between Ap-

pellant's trial counsel and Stuart as to any agreement between the Commonwealth and Stuart:

Q: Mr. Stuart, [the prosecutor] indicated when he began questioning you what kind of arrangement you have in exchange for you coming here to testify today; correct? Do you remember him doing that?

A: Yes.

Q: As I recall, what he said he told you—well, right now you're charged [with] first-degree murder, third-degree murder, and criminal conspiracy; correct?

A: Yes.

Q: You're fully aware of that?

A: Yes.

Q: As I understand the arrangement you have with [the prosecutor], which you made sometime yesterday, in exchange for you coming in here today and testifying, first-degree murder is off the table; is that correct?

A: Yes.

Q: That's your understanding. In exchange for doing this automatically, off the bat, you know you will not have to spend the rest of your natural life in prison; correct?

A: Yes.

N.T. 3/15/07 at 672.

¶ 7 The parties agree that, following Appellant's conviction, on or about April 16, 2007, the Commonwealth dismissed the charges, which were lodged against Stuart. The issue of the Commonwealth dismissing the charges was explored at a post-sentence hearing. Specifically, in explaining why the charges were dismissed against Stuart following Appellant's trial, the following exchange occurred:

[DISTRICT ATTORNEY]: And motion for new trial based on after-discovered evidence ... And the inaccuracy is that at the time Shannon [Stuart] testified Shannon [Stuart's] agreement the whole way through the trial would be he would be facing no more than murder in the third degree.

It was after his testimony, after the family met with him within a month after the verdict I made a decision, probably against everybody's judgment, to dismiss the charges. Mr. [Stuart] knew nothing about that. He testified he thought he was looking at murder in the third degree, so that wouldn't have affected the jury's verdict in any way because he testified based upon what he thought his deal was.

THE COURT: By the way, you can count me as one of the ones that feel that way.

[DISTRICT ATTORNEY]: I understand that. I am willing to accept that responsibility.

THE COURT: Do you want to create a record at all in regard to the allegations in regard to Mr. [Stuart]?

[DEFENSE COUNSEL]: As far as further testimony, Your Honor?

THE COURT: Yeah. Were you going to enter into a stipulation in that regard or how do you want to handle that?

[DISTRICT ATTORNEY]: We can probably enter a stipulation. I can put that on the record as I said before, at the time Mr. [Stuart] testified—

THE COURT: I just heard what you said. It may well be correct. The question is do we need testimony? Do we have to have you take the stand to give that testimony? Do you want to stipulate that's what he would say?

[DEFENSE COUNSEL]: I'll stipulate that's what [the district attorney's] going to say.

Obviously, the only people as I indicated to him that know what discussions were going on with Shannon [Stuart] are [the district attorney], Mr. [Stuart], and Mr. [Stuart's] attorney. I mean, I presume we could call them as witnesses, that is Shannon [Stuart's] attorney or Mr. [Stuart].

THE COURT: I assume, therefore, you have no testimony, for example, that would show that he had actually entered into an agreement where [Stuart] would plead to third-degree murder with consideration. That's the allegation in your petition.

[DEFENSE COUNSEL]: That is correct, Your Honor.

THE COURT: There would be no testimony to actually support that?

[DEFENSE COUNSEL]: Yeah. I mean, the allegations—the situation that came to our attention after the fact, so to speak, my recollection, I haven't received the trial transcript, but at trial Shannon [Stuart] testified his agreement was first [degree murder] would come off the table and that he would be given whatever consideration there would be relative to third-degree murder.

N.T. 6/25/07 at 2–4.

¶ 8 Based on the aforementioned, we conclude the Commonwealth did not violate the dictates of *Brady* in the case *sub judice*. The Commonwealth disclosed to Appellant's counsel that Stuart was going to testify as soon as the Commonwealth was made aware of such information. *See* Trial Court Opinion filed 9/17/07 at 3–4. Regarding the plea agreement the Com-

monwealth had made with Stuart in exchange for his testimony, the trial court, judging the credibility of the district attorney, concluded that the Commonwealth and Stuart had accurately portrayed the agreement as it existed during Appellant's trial. Trial Court's Order filed 7/19/07 at 2–4. That is, the trial court believed the district attorney's indication that, at the time of Appellant's trial, the only promise made to Stuart was that first degree murder was "off the table" and that the Commonwealth would bring Stuart's cooperation to a trial judge's attention at a later date. *Id.* at 3. The trial court further found credible the district attorney's assertion that, after Appellant's trial, the district attorney met with the victim's family and was persuaded that the charges should be dismissed against Stuart, who the family believed "saved" the Commonwealth's case. *Id.* at 3. The trial court also noted that the district attorney's decision to dismiss the charges was based on the district attorney's evaluation after trial that Stuart was a person, who was lesser involved in the crime than many of the other group members. *Id.* at 3. The trial court specifically concluded that:

> But, in any event, we are satisfied all that occurred after the trial had ended, that the statement that was given to the jury at the time was a correct statement and reflected the actual agreement that then existed, and the fact that the Commonwealth subsequently did a further evaluation based on the outcome of the trial and how much they believed Shannon [Stuart] would help their case, also, their belief as to Shannon [Stuart's] role in the case, and I think the Commonwealth basically accepted Shannon [Stuart's] [trial testimony] his gun didn't fire for some reason. . . .

*     *     *

> [T]he Court is satisfied that the Commonwealth has the legal right to do what they did and that it was nothing improper in regard to the way the case was presented to the jury and that the jury was accurately told the agreement that existed at the time of the trial.

*Id.* at 3–4.

■ ¶ 9 We find no abuse of discretion with regard to the trial court's conclusions that the Commonwealth fully disclosed the agreement it had with Stuart at the time of Appellant's trial and that the Commonwealth did not withhold any information regarding its negotiations with Stuart. We specifically note that, although Appellant suggests otherwise, there is no proof that the Commonwealth must have known at the time of trial that it was going to dismiss the charges lodged against Stuart or that the Commonwealth and Stuart had a "secret deal" regarding such. Appellant's pure conjecture is insufficient to prove a *Brady* violation occurred. *See Champney, supra* (holding mere conjecture that the Commonwealth had a specific, undisclosed deal with a witness during or prior to the appellant's case is insufficient to prove a *Brady* violation). While we recognize that Appellant may have concerns because the Commonwealth ultimately dismissed the charges against Stuart, we agree with the trial court that the district attorney adequately explained his reasons for so doing and that there was no discovery violation with regard to Stuart's plea agreement as it existed at the time of Appellant's trial. Finally, we note that Appellant's attorney extensively cross-examined Stuart regarding the motivations for his trial testimony and established Stuart's bias in favor of the Commonwealth in the hopes of receiv-

ing leniency.[2] *See Champney, supra.*

¶ 10 Affirmed.

**2.** In his brief, Appellant makes a bald assertion that Desiree Garcia violated a sequestration order when she was present during Appellant's preliminary hearing. This issue is waived because it was not adequately developed in Appellant's brief, Pa.R.A.P. 2119, and Appellant failed to raise the issue in his court-ordered Pa.R.A.P.1925(b) statement, *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998).