**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**George BURKHARDT, Appellant.**

Superior Court of Pennsylvania.

Submitted June 23, 2003.
Filed Sept. 22, 2003.

Burton A. Rose, Philadelphia, for appellant.

Susan E. Moyer, Asst. Dist. Atty., Lancaster, for Com., appellee.

BEFORE: DEL SOLE, P.J., and JOHNSON, HUDOCK, MUSMANNO, LALLY–GREEN, KLEIN, BENDER, BOWES and GRACI, JJ.

OPINION BY JOHNSON, J.:

¶ 1 On this appeal, we are asked to determine whether the Commonwealth's failure to disclose a material witness's subjective expectation of leniency in exchange for that witness's testimony results in the denial of due process warranting a new trial. We conclude that the supposed understanding of the witness, if established, would be relevant to that witness's credibility and therefore material. Nevertheless, on the facts presented here, we conclude, had the expectation of leniency been presented to the jury, that it would not have raised a reasonable probability that the result of the trial would have been different. Accordingly, we determine that a new trial is not warranted, and we affirm the denial of post-conviction collateral relief.

¶ 2 On January 12, 1990, a jury convicted George W. Burkhardt of two counts of second degree murder. The Honorable Michael A. Georgelis sentenced Burkhardt to two concurrent life sentences. Burkhardt filed post-verdict motions which were denied. Following direct appeal, this Court affirmed and our Supreme Court granted, then dismissed, Burkhardt's petition for allowance of appeal. *See Commonwealth v. Burkhardt,* 421 Pa.Super. 646, 613 A.2d 26 (1992) (unpublished Memorandum), *appeal granted,* 534 Pa. 635, 626 A.2d 1155 (1993), *dismissed as improvidently granted,* 535 Pa. 547, 636 A.2d 1117 (1994).

¶ 3 Burkhardt filed his first petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546, on June 20, 1994. The court appointed counsel, a hearing was held, and the court denied relief. Burkhardt appealed and we affirmed. On November 7, 1997, our Supreme Court denied allowance of appeal. *See Commonwealth v. Burkhardt,* 695 A.2d 434 (Pa.Super.1997) (unpublished Memorandum), *appeal denied,* 550 Pa. 676, 704 A.2d 634 (1997).

¶ 4 Following an unsuccessful *pro se* petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, which was rejected by the federal district court, the Court of Appeals for the Third Circuit, and the United States Supreme Court, Burkhardt filed his second PCRA petition on December 3, 1999. The Commonwealth filed its answer after which the trial court stayed proceedings pending final disposition of Burkhardt's federal appeal. Following a

hearing on March 29, 2001, and the filing of briefs by both parties, Judge Georgelis denied relief, prompting this present appeal.

¶ 5 In filing his petition on December 3, 1999, Burkhardt invoked an exception contained in the PCRA permitting a filing beyond the standard one-year limitation following the date the judgment of sentence becomes final. *See* 42 Pa.C.S. § 9545(b)(1). He averred in his petition that the facts upon which his claim is predicated were unknown to him and could not have been ascertained with due diligence prior to November 12, 1999, the date upon which Robert Paul O'Neill, a material witness at Burkhardt's trial, signed an affidavit relating the facts surrounding his testimony at that trial. Such an allegation of after-discovered evidence brings a PCRA petition within the permissible time limitations found in 42 Pa.C.S. § 9545(b)(1)(ii) and (b)(2). The distinguished trial judge found the petition to be timely filed, inasmuch as it was filed within sixty days of the date O'Neill executed his affidavit. We accept Judge Georgelis's finding and proceed to our review of the denial of PCRA relief.

¶ 6 Burkhardt presents the following question for our review:

> Was the Appellant deprived of due process of law by the failure to reveal at trial the full extent of the arrangement between key prosecution witness Robert O'Neill and the prosecutor in exchange for trial testimony against this Appellant?

Brief for Appellant at 3.

█ ¶ 7 We begin with our standard of review. "We review an order granting or denying PCRA relief to determine whether the PCRA court's decision is supported by evidence of record and whether its decision is free from legal error." *Commonwealth v. Liebel,* 825 A.2d 630,

632 (Pa.2003); *see also Commonwealth v. Wilson,* 824 A.2d 331, 333 (Pa.Super.2003) (*en banc*) (same). "Great deference is granted to the findings of the PCRA court, and these findings will not be disturbed unless they have no support in the certified record." *Wilson,* 824 A.2d at 333. A second or any subsequent post-conviction request for relief "will not be entertained unless a strong *prima facie* showing is offered to demonstrate that a miscarriage of justice may have occurred." *Commonwealth v. Carpenter,* 555 Pa. 434, 725 A.2d 154, 160 (1999) (quoting *Commonwealth v. Lawson,* 519 Pa. 504, 549 A.2d 107, 112 (1988)). "A petitioner makes a *prima facie* showing if he 'demonstrates that either the proceedings which resulted in his conviction were so unfair that a miscarriage of justice occurred which no civilized society could tolerate, or that he was innocent of the crimes for which he was charged.'" *Id.* (quoting *Commonwealth v. Morales,* 549 Pa. 400, 701 A.2d 516, 520–21 (1997)); *see also Commonwealth v. Palmer,* 814 A.2d 700, 709 (Pa.Super.2002) (same). Finally, we remain always cognizant that the formal purpose of the Superior Court is to maintain and effectuate the decisional law of our Supreme Court as faithfully as possible. *See Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382, 386 (1985); *accord Commonwealth v. Shaffer,* 696 A.2d 179, 183 (Pa.Super.1997) (citing *Commonwealth v. Fiore,* 445 Pa.Super. 401, 665 A.2d 1185, 1193 (1995), *reversed on other grounds,* 557 Pa. 453, 734 A.2d 840 (1999)).

¶ 8 It is with these stringent standards in mind that we now turn to Burkhardt's allegations. Burkhardt argues that both his federal and state constitutional rights to due process were violated by the failure to reveal to him at the time of trial that the crucial Commonwealth witness had obtained an arrangement through his attorney that, in exchange for testimony against

Burkhardt, he would be given "consideration" by the District Attorney (D.A.) in determining the charges to which the witness would be permitted to plead guilty. Brief for Appellant at 7. A brief statement of the facts surrounding Burkhardt's arrest and prosecution are helpful in placing this contention in context.

¶ 9 In our unpublished Memorandum filed May 12, 1992, at No. 2402 Philadelphia 1991, this Court set forth the following:

On September 17, 1979, Horace Swarr and his sister, Mary Swarr, were found bound and gagged in their home. Mary Swarr was dead and Horace Swarr died the next day at the hospital. No arrests were made for nearly a decade until January 14, 1989 when Robert Paul O'Neill ("O'Neill") was arrested in Maryland by the Maryland State Police. Although O'Neill originally denied any involvement in the Swarrs' deaths, he eventually gave a statement to the police implicating John Askew ("Askew"), Dale Healy ("Healy"), and George W. Burkhardt ("Burkhardt"), the defendant in this case. On January 27, 1989[,] Burkhardt was charged with two counts of criminal homicide and one count of criminal conspiracy to commit robbery.

*Commonwealth v. Burkhardt,* No. 2402 Philadelphia 1991, slip Memorandum at 1, 421 Pa.Super. 646, 613 A.2d 26.

¶ 10 The importance of O'Neill's testimony to the prosecution's case against Burkhardt cannot be overemphasized. It was only after police were able to connect O'Neill to the crime, and O'Neill was finally arrested on January 14, 1989, that any progress was made tying Burkhardt, Askew and Healy to the two homicides. Notes of Testimony, 1/5/90, at 20–22. O'Neill's credibility was placed in question by Burkhardt's trial defense counsel, Michael A. George, in his opening statement to the jury, when he stated:

If you don't believe Robert O'Neill, then you might as well come on back out. Robert O'Neill is going to be the keystone of this case.

The prosecution, I believe, is going to rest their entire case on the accusations of one man about a crime that occurred in 1979. The same man who, the evidence is going to show, knowingly came to this city in 1979 and bound and tied up two old people and then left them there.

*Id.* at 45.

¶ 11 At Burkhardt's trial, the direct examination of O'Neill took place on Friday afternoon, January 5, 1990, conducted by John A. Kenneff, Lancaster County Assistant District Attorney. During direct examination, no question arose regarding any understanding or agreement between O'Neill and the Commonwealth. *Id.* at 76–121. In anticipation of lengthy cross-examination, Judge Georgelis adjourned the case at 4:35 p.m., with proceedings to resume on Monday morning, July 8, 1990. *Id.* at 121–124. On Monday morning, Attorney George's cross examination and re-cross examination lasted from shortly after 9:00 a.m. until 10:42 a.m., with only brief redirect examination by Attorney Kenneff in between. *Id.* at 126–190, 203–213. Attorney George conducted vigorous cross-examination touching upon the period before the crime when O'Neill first came in contact with the other three actors, the specific details concerning the planning of the robbery and the steps taken within the victims' home, events immediately following the commission of the crime, and contacts between O'Neill, his cohorts, the police and various defense counsel. However, the only testimony presented to the jury during trial touching upon the issue of any potential agreement

between O'Neill and the Commonwealth was as follows:

*By Mr. George:*

Q  Mr. O'Neill, you have a plea agreement now, don't you?

A  No, I don't.

Q  No agreement at all with the Commonwealth?

A  What do you mean by an agreement?

Q  Do you have any agreement with the Commonwealth in return for your testimony?

A  The same thing I told you before. The same point that I had already told you.

Q  The jury didn't hear so why don't you tell the jury?

A  They told me that if I testify that the four of us would be in different prisons, that the police would testify on my behalf, how I cooperated and that they would let me spend some time with my children before I am sentenced.

Q  Is that all the terms of your agreement?

A  And that if anybody else— if they give anybody else consideration in their sentence I will at least get the same consideration.

Q  Is there any other terms, sir?

A  No.

*Id.* at 140–41. Later on, Attorney George returned to the question of any agreement, inquiring as follows:

Q  Part of the agreement is that the Commonwealth will speak on your behalf on the charges?

A  Yes.

Q  What are you charged with, Mr. O'Neill?

A  Homicide.

Q  How many charges of homicide?

A  Two, two.

Q  Is the Commonwealth intending to pursue the charge of felony murder against you?

A  I don't know.

Q  Do you agree that it is a possibility?

A  Yes.

Q.  Do you agree that they pursued the charges of felony murder against all the other Defendants?

A  Yes.

\* \* \* \* \*

Q  Let's cut through it all, Mr. O'Neill.

Isn't it true that the reason you're testifying is because you don't want to be charged with second degree murder?

A  I'm hoping that I would not be. Yes.

Q  You're hoping you will be charged with a lesser charge?

A  I'm hoping.

Q  Like third degree murder?

A  Anything.

Q  You don't think you ought to do any time for this crime, do you?

A  I don't think any of us should.

Q  Why is that?

A  Because it was unintentional.  It was an accident what happened.

Q  And you will do anything to stop from having to serve life, wouldn't you?

A  Well, if telling the truth is doing anything, I will do anything.

*Id.* at 144–45, 146–47.

¶ 12 A Post–Conviction Relief Act Hearing was held March 29, 2001, more than eleven years after trial, to explore into the alleged agreement concerning a reduced sentence arising after O'Neill's cooperation.  At that hearing, Judge Georgelis received testimony from O'Neill, William Wheatley, who was O'Neill's attorney at the time of the Burkhardt trial, and John

A. Kenneff, who, in 1990, was a part-time assistant district attorney (A.D.A.) in Lancaster County. On this appeal, Burkhardt's PCRA counsel concedes that there was no denial of a plea agreement by O'Neill. Counsel merely attacks O'Neill's failure to "amplify" on the four specific agreements to which he had testified. PCRA Hearing Transcript (PCHT), 3/29/01, at 5–6.

¶ 13 At the PCRA hearing, O'Neill testified that he had only met with the A.D.A. once, while held in a bullpen upon his extradition from Maryland, and that there was no discussion at that one meeting about any benefits O'Neill would receive if he testified for the prosecution. *Id.* at 9–10. At that single meeting, Kenneff handed O'Neill transcripts from the other trials and asked O'Neill to review them. *Id.* at 9. Although O'Neill testified to various statements made to him by his attorney, Wheatley, he was quite clear that the A.D.A.'s name never came up during those representations by Wheatley as to possible advantages arising from favorable testimony. *Id.* at 11. His attorney asked O'Neill on direct examination: "So neither Jack Kenneff nor any of the detectives, Detective Henry, Detective Barley or Detective Geesey, ever met with you to go over what benefits would come to you in exchange for your testimony, it only came to you through Mr. Wheatley?" *Id.* at 13. O'Neill responded "I believe so. I don't recall talking to anyone else about it." *Id.* On cross-examination, O'Neill again conceded that no offers of a reduction in sentence were ever made "by the Commonwealth of Pennsylvania, anyone having to do with the Commonwealth, that being Jack Kenneff or anyone in the D.A.'s Office." *Id.* at 15. O'Neill's assumptions concerning an understanding were based solely upon his conversations with his attorney, Wheatley. *Id.* at 15, 25.

¶ 14 While still under cross-examination, O'Neill admitted being shown letters sent from A.D.A. Kenneff to his trial attorney, Wheatley, subsequent to his testimony in the Burkhardt case. O'Neill testified against Burkhardt on January 5, 1990. The letters were dated January 16, 1990 and February 22, 1990. The first letter outlined matters upon which the Commonwealth requested information from O'Neill and advised that until each of those items of information was satisfactorily presented to the Commonwealth, no recommendation for reduction of sentence would be made. *Id.* at 34. At the PCRA hearing, O'Neill recalled the letter and testified to providing the information requested in response thereto. *Id.* The second letter, dated February 22, 1990, contained the terms of O'Neill's guilty plea that was tendered March 1, 1990. O'Neill testified that the first time an offer for reduction of sentence was conveyed to him was in the letter of February 22nd, received by his attorney more than a month after his testimony in the Burkhardt trial. *Id.* at 35.

¶ 15 O'Neill's defense attorney in 1990, Mr. Wheatley, testified to having made numerous requests of A.D.A. Kenneff for a specific plea agreement. *Id.* at 43. He testified that he initiated requests for a deal "after every preliminary hearing and after every trial. Particularly after the first trial" . . . "[b]ut Mr. Kenneff would never budge." *Id.* Wheatley testified that the A.D.A. "never made any offer that Mr. O'Neill would be permitted to plead guilty to anything less than second degree murder." *Id.* at 44. Wheatley was quite clear that "[t]he only thing Mr. Kenneff— and he indicated this from pretty much the beginning, was that if Mr. O'Neill cooperated and testified truthfully at all proceedings, that his testimony would be taken into consideration and his cooperation would be taken into consideration at such time as his charges were dealt with." *Id.*

Nevertheless, it was Wheatley's *opinion* that there would eventually be a reduced offer, in spite of the fact that there was nothing to that effect that Kenneff or anybody else in the D.A.'s office ever told him. *Id.* at 47. As Wheatley understood, and as he testified, the full extent of his understanding with the D.A.'s office was that, if O'Neill testified and testified truthfully, his cooperation and truthful testimony would be taken into consideration when dealing with his charges. *Id.* at 52. There was nothing further.

¶ 16 John A. Kenneff, the A.D.A. who prosecuted all four cases, expressly denied that any plea offer was tendered to O'Neill, either to him personally or through his attorney, Wheatley. *Id.* at 60. Kenneff testified that it was only after Burkhardt's trial that an offer was tendered. *Id.* After Burkhardt's trial had been completed, Kenneff came to the conclusion that O'Neill was telling the Commonwealth all that he knew and therefore, there was no reason to delay further in deciding what to do with O'Neill's pending case. *Id.* at 60–61. Kenneff corroborated Wheatley's earlier testimony that all attempts by defense counsel to obtain a specific plea agreement prior to the conclusion of Burkhardt's trial had been rebuffed. *Id.* at 61.

■ ¶ 17 We turn now to consider the arguments and contentions advanced by Burkhardt in support of his appeal. Burkhardt contends that the issue presented is whether he is entitled to relief pursuant to the decision of our Supreme Court in the matter of *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000). He argues that the witness, O'Neill, "had reason to believe, from representations communicated by the prosecutor through his attorney, that the District Attorney would provide [an opportunity to plead to a lesser charge than 2nd degree murder] upon conclusion of the trial, provided that the witness gave testimony that was favorable to the Commonwealth in [Burkhardt's] case." Brief for Appellant at 7. He argues that *Strong* compels that Burkhardt be afforded a new trial. We disagree.

¶ 18 In *Strong*, our Supreme Court was called upon to review the denial of post-conviction collateral relief after the defendant had been convicted of first degree murder and sentenced to death. *See Strong*, 761 A.2d at 1170. In 1983, Strong and an accomplice, James Alexander, were hitchhiking in Luzerne County and were picked up by the eventual victim, John Henry Strock. *See id.* at 1169. Strock was shot to death with a .20 gauge shotgun and Strong and Alexander drove off in the victim's car, abandoning it when it ran out of gas. *See id.* After the two assailants were captured in New York, Alexander agreed to cooperate with the authorities, waived extradition, and returned to Pennsylvania where he assisted the police in locating the victim's body. *See id.* at 1170.

¶ 19 At Strong's trial, Alexander testified, placing the onus of the victim's death on his companion. *See id.* Prior to trial, Strong had requested any evidence pertaining to an agreement between Alexander and the Commonwealth. *See id.* The assistant district attorney prosecuting the case assured Strong that no deal had been made in exchange for Strong's testimony. *See id.* On the witness stand, Alexander denied that his testimony against Strong was in exchange for favorable treatment, although he also faced trial on charges of murder and kidnapping. *See id.* Strong was convicted and sentenced to death. Alexander pled guilty on the murder and kidnapping charges and received a sentence of 40 months' incarceration. *See id.*

¶ 20 In 1995, Strong filed a *pro se* PCRA petition and the court appointed counsel. *See id.* PCRA counsel requested copies of

all relevant documents in the prosecution's file. *See id.* Certain letters from the D.A.'s file revealed that Alexander's public defender and the Luzerne County D.A. had been discussing a plea agreement with Alexander prior to Strong's trial. *See id.* This information had not been made available to Strong at any time prior to the response to the request by PCRA counsel in 1997. *See id.* At his PCRA hearing, Strong alleged and argued that in failing to reveal this information which he specifically requested prior to trial, the prosecution had deprived him of a fair trial as mandated by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). At the conclusion of the PCRA hearing, the trial court determined that no actual deal had been struck between Alexander and the Commonwealth and, therefore, no material evidence had been withheld from Strong in violation of *Brady.*

¶ 21 In reversing the trial court and in concluding that the Commonwealth's failure to disclose the understanding it had with its witness violated due process, our Supreme Court relied upon the following principles. Where evidence material to the guilt or punishment of the accused is withheld, irrespective of the good or bad faith of the prosecutor, a violation of due process has occurred. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. The *Brady* rule has been extended to require the prosecution to disclose exculpatory information material to the guilt or punishment of an accused even in the absence of a specific request. *See United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) *(followed in Commonwealth v. Moose,* 529 Pa.218, 602 A.2d 1265, 1271–73 (1992)). Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Any implication, promise or understanding that the government would extend leniency in exchange for a witness's testimony is relevant to the witness's credibility. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). When the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. *See United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Impeachment evidence is material, and thus subject to obligatory disclosure, if there is a reasonable probability that had it been disclosed the outcome of the proceedings would have been different. *See Bagley,* 473 U.S. at 678, 105 S.Ct. 3375; *see also Agurs,* 427 U.S. at 112–13, 96 S.Ct. 2392; *Commonwealth v. Wallace,* 500 Pa. 270, 455 A.2d 1187, 1192 (1983).

¶ 22 In reversing the PCRA court's denial of relief, our Supreme Court focused on circumstantial evidence in finding an understanding between Alexander and the Commonwealth. After concurring in the trial court's assessment that Alexander's testimony denying the existence of an agreement lacked credibility, *see Strong,* 761 A.2d at 1174, the Court went on to state:

Even if we disregard Alexander's testimony at the evidentiary hearing, sufficient circumstantial evidence of an understanding between Alexander and the Commonwealth regarding Alexander's testimony at [Strong's] trial exists. Alexander and [Strong] had each been indicted on charges of murder, kidnapping and conspiracy. The Commonwealth did not seek a joint trial of the alleged co[-]conspirators, and in fact dropped the conspiracy charge against Alexander prior to [Strong's] trial. The Common-

wealth, as the letters revealed, had offered Alexander a sentence of two years on the charges of murder and kidnapping, pending information on his prior record. [Alexander's counsel], upon receipt of the prior record information, indicated a willingness to have Alexander plead guilty in exchange for a sentence of 36 months, rather than 24 months. Ultimately, Alexander pled guilty and received a sentence of 40 months. Unlike the trial court, we do not find this additional 4 months to be a critical departure from the understanding that the parties had been discussing prior to [Strong's] trial. The fact that the trial prosecutor was unaware of the negotiations between his superior and counsel for Alexander is irrelevant. As the United States Supreme Court has repeated time and again, the good faith or the bad faith of the individual prosecutor is irrelevant in determining whether or not the accused has been afforded a fair trial. Accordingly, we find the record establishes the existence of an understanding between the Commonwealth and Alexander that he would be treated with considerable leniency in exchange for his testimony against [Strong]. This understanding although not articulated in an ironclad agreement, was sufficient to implicate the due process protections of *Brady*.

*Strong*, 761 A.2d at 1174 (citation omitted). The letters that the Supreme Court evaluated in reaching its decision were between Alexander's defense counsel, the District Attorney for Luzerne County and the Pennsylvania State Trooper in charge of the investigation of the victim's murder. All of the letters pre-dated the dates of Strong's murder trial and dealt either with a potential plea agreement or the conditions under which Alexander was incarcerated prior to trial. *See id.* at 1172.

¶ 23 When we compare the facts surrounding the Supreme Court's conclusion finding a *Brady* violation in *Strong* with the facts presented on this appeal, we are unable to conclude that the result on this appeal is controlled by the result in *Strong*, as Burkhardt argues in his brief. In *Strong*, the witness's counsel was in active negotiations seeking a plea agreement beginning no later than December 6, 1983, all before the trial, conviction and sentence took place in October 1984. *See id.* 761 A.2d at 1170, 1172. In the case now before us, the un-contradicted testimony of both the trial A.D.A. and the witness's attorney established that efforts by the witness's counsel even to discuss a plea agreement were uniformly rebuffed. PCHT, 3/29/01 at 43, 61. The only letters involved in Burkhardt's trial were written by the Commonwealth *after* the trial, making clear that there could not be any plea agreement unless the witness, O'Neill, provided the information that the Commonwealth required. *Id.* at 34–35. The witness in *Strong* testified at the PCRA hearing that he had been instructed by counsel to state, when he testified at Strong's trial, that no deal had been made, in spite of the fact that he understood his testimony against Strong was in exchange for a deal for minimum jail time. *See Strong*, 761 A.2d at 1172. By way of contrast, O'Neill was unable to testify to any information coming to him from anyone other than his own attorney, in spite of valiant attempts by Burkhardt's counsel to develop circumstances supporting an agreement.

¶ 24 Counsel concedes that this case does not involve any overt denial or perjury under oath by the witness, as was present in *Strong*. Nevertheless, counsel instead insists that the "impressions" and "expectations" that the witness claims he had are sufficient to trigger the protections of *Brady*. We are asked to deter-

mine whether a witness's sense impressions are enough to establish the existence of an "understanding" between the witness and the Commonwealth, where the undisputed facts reveal that neither the Commonwealth nor the witness's attorney labored under any delusion that an agreement existed, or even that an agreement would be discussed prior to the conclusion of all three trials involving the co-conspirators. We conclude that such "impressions" or "expectations," without more, cannot trigger the rules laid down in *Brady, Bagley, Giglio* and their progeny.

¶ 25 We recognize that Justice Castille, joined by Justice Newman, in a very thoughtful and incisive opinion, would find that the Commonwealth may be under a duty to disclose a promise of consideration and fair treatment as a result of cooperation by a witness. *See Strong*, 761 A.2d at 1178–79 (Castille, J., concurring). There, however, the Commonwealth had expressly denied any promises or agreement and the witness had intentionally misled the jury while under oath. In the case we now review, there is absolutely no evidence to support a theory that the Commonwealth deliberately declined to enter into plea negotiations in order to enhance the witness's credibility before the jury. Burkhardt does not argue, nor do we accept any suggestion, that Commonwealth attorneys regularly engage in attempts to keep promises of leniency both off the record and implicit, rather than explicit. To decline to enter into plea agreements until after the Commonwealth is satisfied that a witness has testified truthfully represents a sound, professional policy that should not be discouraged. We do not read *Strong* as requiring otherwise.

¶ 26 Judge Georgelis recognized that, under *Brady, Giglio,* and *Strong,* the absence of an ironclad contract between the prosecution and the witness pertaining to the witness's testimony is not dispositive of a *Brady* claim. Opinion, 9/13/01, at 5. He was aware that, under *Giglio,* any implication, promise or understanding that the government would extend leniency in exchange for a witness's testimony is relevant to the witness's credibility. In reviewing all of the testimony at the PCRA hearing and from the original trial, he concluded that there was no evidence to suggest that the arrangement between the Commonwealth and O'Neill included anything more than the four promises to which O'Neill testified at Burkhardt's trial in 1990. The record supports the trial court's conclusion that all the details of the arrangement of which the Commonwealth was aware were placed on the record and were before the jury. Although defense counsel repeatedly asked for further assurances from the Commonwealth, none was provided. The trial court's conclusions are supported by the evidence of record and cannot be disturbed. *See Liebel,* 825 A.2d at 632.

■■■■■■ ¶ 27 Judge Georgelis did not analyze whether the statements made to O'Neill's counsel but not communicated to O'Neill constituted "a promise or understanding that the government would extend leniency" in exchange for O'Neill's testimony, thereby triggering *Giglio.* Wheatley testified that the A.D.A. had stated to him: "[I]f Mr. O'Neill cooperated and testified truthfully at all proceedings, that his testimony would be taken into consideration and his cooperation would be taken into consideration at such time as his charges were dealt with." PCHT, 3/29/01, at 44. First, for a District Attorney to indicate that truthful testimony and cooperation would be considered in future proceedings falls far short of any promise of leniency and represents nothing more than the type of general response that D.A.'s have been uttering for decades. It

is the kind of general promise of which effective defense counsel is aware and for which counsel would examine a prosecution witness as a matter of course. We decline to conclude that *Brady/Bagley/Strong* mandate that the Commonwealth has the burden of affirmatively disclosing such a generic statement absent a request from a defendant for such a disclosure. Moreover, a defendant's subjective hope and even expectation of more lenient treatment is not something the Commonwealth is required, or even able, to disclose.

¶ 28 Were we to assume that disclosure might have been required in this case, Burkhardt remains un-entitled to relief. Assuming that the promise is material, it must still be established that the failure to produce this evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced. *See Bagley*, 473 U.S. at 678, 105 S.Ct. 3375; *see also Agurs*, 427 U.S. at 112–13, 96 S.Ct. 2392. At trial, the jury received O'Neill's testimony that he had been given four promises by the Commonwealth. This agreement was fully revealed to both Burkhardt's attorney before trial and to the jury. O'Neill further testified that he was "hoping" that the Commonwealth would allow him to plead to a charge lesser than second degree murder. Judge Georgelis, who has been responsible for this case throughout, and who presided at Burkhardt's trial, observed:

> The Defendant's attorney arduously argued O'Neill's self-serving motive to the jury during closing arguments. He specifically told the jury that O'Neill is a "skillful liar" and a "desperate man" who is trying to avoid jail time. He repeatedly reminded the jury that O'Neill's credibility was suspect. In fact, O'Neill's credibility was the focal

> point of the Defendant's closing argument.

Opinion, 9/13/01, at 8 (citations to the trial transcript omitted). Thus, even were we to determine that the limited statements of the district attorney to Burkhardt's counsel were material, in the light of the evidence that was produced for the jury and the vigorous arguments attacking the witness's credibility throughout the trial, we cannot say that there is a reasonable probability that the result of Burkhardt's trial would have been different if the jury had also been informed that the Commonwealth was prepared to consider O'Neill's conduct before the Burkhardt jury in determining the Commonwealth's position in regards to O'Neill's own prosecution. On the contrary, this record compels our conclusion that the "understanding" that Burkhardt would have us find is illusory. No agreement existed here other than the ones disclosed to the jury. The Commonwealth may not be charged with knowledge of what is hidden in the defendant's mind. Due process has not been violated. We find that Judge Georgelis's decision is supported by evidence of record and is free of legal error. Accordingly, we affirm the order denying PCRA relief.

¶ 29 Order AFFIRMED.

¶ 30 Judges DEL SOLE, HUDOCK, MUSMANNO, LALLY–GREEN, BENDER, BOWES and GRACI joined this Majority Opinion.

¶ 31 Judge KLEIN files a Concurring Statement in which Judge GRACI joins.

CONCURRING STATEMENT BY KLEIN, J.:

¶ 1 I agree with the majority that under *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000), an understanding between a material witness and the Commonwealth that some kind of leniency would be a reward for testifying need not

be an iron-clad agreement in order to require that it be revealed to the defense. At the same time, the witness' mere subjective expectation that he or she might receive consideration for testimony, without any action by the Commonwealth to create that expectation, is not something the Commonwealth would have to disclose. In fact, under those circumstances, the Commonwealth would not have any real way of knowing what the witness' expectations were.

¶ 2 The key factor in this case is that despite the best efforts of defense counsel, the Commonwealth would not commit to anything beyond those promises that were placed on the record. While O'Neill had the hope, and perhaps even expectation, that he would be charged with less than second-degree murder, the Commonwealth did nothing to engender such a hope or expectation. Further, O'Neill told the jury he had the hope of being charged with less than second-degree murder. Therefore, this record is devoid of anything showing that the Commonwealth encouraged O'Neill to testify that was not fully placed before the jury.

¶ 3 Judge GRACI joins the Concurring Statement by KLEIN, J.