J-A02028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                                               : PENNSYLVANIA
                                                        :
            v.                                            :
                                                        :
                                                        :
WALTER W. CABLE                           :
                                                        :
          Appellant                : No. 645 WDA 2022

Appeal from the Judgment of Sentence Entered January 10, 2022
In the Court of Common Pleas of Westmoreland County
Criminal Division at CP-65-CR-0002290-2018

BEFORE:   BOWES, J., MURRAY, J., and PELLEGRINI, J.*

MEMORANDUM BY MURRAY, J.:           **FILED: MARCH 10, 2023**

Walter W. Cable (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder, conspiracy to commit first-degree murder, and abuse of a corpse.[1]  We affirm.

Appellant's convictions arose from the killing of Ronny Cable[2] (the Victim), "and the destruction of her body by fire, which were alleged to have taken place on or about February 17, 2017."  Trial Court Opinion, 5/10/22, at 1.  The Commonwealth also charged Devin Akamichi (Akamichi), at docket CP-65-CR-0002291-2018, with the Victim's murder, conspiracy to commit

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2501(a), 903(a)(1), and 5510; the jury found Appellant not guilty of robbery, 18 Pa.C.S.A. § 3701.

[2] Appellant and the Victim have the same last name but are not related.

murder and abuse of a corpse. Akamichi testified for the Commonwealth at Appellant's trial. At this writing, the docket in Akamichi's case shows his trial is scheduled for March 20, 2023.

## CASE HISTORY

Appellant met the Victim in October 2015, although they "lost touch" when the Victim began dating Akamichi. Trial Court Opinion, 5/10/22, at 5 (citations to notes of testimony omitted). The Victim and Akamichi dated for several months in 2016. *Id.*

In February 2017, Appellant was with Akamichi and another individual, Steve Zastawniak (Zastawniak), when the men "ran into the [V]ictim at a gas station" in Greensburg, Pennsylvania. *Id.* at 5-6. The Victim, Appellant and Akamichi[3] spent the next day and a half drinking at the Victim's home, shopping at Walmart and a liquor store, and drinking at the Hillview Tavern. *Id.* at 6-7. At the Hillview Tavern, Appellant "told Akamichi that he intended to kill the [V]ictim…." *Id.* at 7.

Thereafter,

> [Appellant], Akamichi, and the [V]ictim left the tavern and drove to a wooded area which was a campsite formerly owned by [Appellant's] family. Akamichi had been to the wooded location before with [Appellant]. The three got out of the car and began walking into the woods with [Appellant] leading the way. At some

---

[3] Zastawniak accompanied Appellant and Akamichi to the Victim's home, where the three men "began drinking" and "spent the night." Trial Court Opinion, 5/10/22, at 6 (citations to notes of testimony omitted). The following morning, Appellant, Akamichi and the Victim "dropp[ed] off Zastawniak" in Greensburg. *Id.*

point, [Appellant] retrieved a hammer from the ground, beat the [V]ictim in the head with the hammer[,] and choked her until she died. Akamichi watched as [Appellant] arranged the [V]ictim's body, removed his bloodied shirt, and set the shirt and the [V]ictim's jacket on fire.

According to Akamichi, [Appellant] then started to place wood on top of the [V]ictim's body and ordered Akamichi to do the same. After setting fire to the wood covering the [V]ictim, [Appellant] and Akamichi went to Akamichi's car and removed the [V]ictim's purse. [Appellant] disposed of the [V]ictim's cell phone and purse in the fire, keeping money and pills that had been contained in the purse. Throughout the night, [Appellant] and Akamichi added wood to keep the fire burning. At one point, [Appellant] broke up the [V]ictim's bones with a shovel. After sunrise, while the [V]ictim's body was still burning, [Appellant] and Akamichi drove to a GetGo gas station in Delmont, Westmoreland County, so that they could get food and gasoline (both for Akamichi's car and to fuel the fire). [Appellant] and Akamichi then returned to the crime scene and added wood and gasoline to the fire. Once the [V]ictim's body was fully burned, [Appellant] and Akamichi left the area and went to [Appellant's] residence to sleep. A few days later, [Appellant] and Akamichi returned to the wooded area to make sure that all evidence of the [V]ictim's body had been destroyed.

Trial Court Opinion, 5/10/22, at 7-8 (citations to notes of testimony omitted).

The Victim's mother, Beverly Richardson, contacted police on February 27, 2017. Richardson had not heard from the Victim since February 10, 2017; no one was home when she went to the Victim's home, although the Victim's car was there. *Id.* at 4. When police forced entry into the home, it was "a mess," which according to Richardson, "was unusual." *Id.* Richardson filed a missing person's report and began searching for the Victim.

More than a year later, on March 30, 2018, the Commonwealth charged Appellant with the Victim's murder. Police had interviewed the Victim's

neighbor, Tammy Domiano, who provided video footage from her home security cameras. Domiano had contacted police after she saw "on the news that [the Victim] was missing." N.T., 6/2/21, 72-73. The footage showed the Victim leaving her home with Appellant and Akamichi during the "late evening hours of February 16, 2017." Affidavit of Probable Cause, 3/30/18, at 1. "During review of additional surveillance footage in the days following, [the Victim] never returned to her residence[.]" *Id.*; *see also* N.T., 6/2/21, at 79, 82 (Domiano testifying she "watched [the video] clear to February 28th" and "never [saw the Victim] come back.").

Police also reviewed surveillance video from the Walmart where the Victim was identified entering the store "in the company of two white males … [who] were subsequently identified by Beverly Richardson as [] Akamichi and [Appellant]." *Id.* Akamichi and Appellant were also seen in video surveillance (and receipts confirmed their presence) at a Get-Go convenience store at 4:45 a.m. on February 17, 2017. *Id.* at 2.

When police interviewed Akamichi, he relayed that Appellant had killed the Victim. *Id.* Akamichi led police to the murder scene, where the Mercyhurst University Department of Forensic Anthropology later recovered evidence (including the Victim's hair and bones). When police interviewed Appellant, he admitted to being with Akamichi and the Victim on February 17, 2017. *Id.* Appellant claimed he and Akamichi had dropped the Victim off at her home around midnight. *Id.*

Appellant's trial began on June 2, 2021, and concluded with the jury's verdicts on June 10, 2021. On January 10, 2022, the trial court sentenced Appellant to life in prison. Appellant filed post-sentence motions claiming the Commonwealth failed to disclose details of its favorable treatment of Akamichi in violation of **Brady v. Maryland**, 373 U.S. 83 (1963) (holding that due process is violated when the prosecution withholds information favorable to the defense). Appellant also claimed the jury's verdicts were against the weight of the evidence. The trial court held a hearing on April 1, 2022. Akamichi's attorney, Kenneth Noga, Esquire, stated, "We were hoping, due to [Akamichi's] cooperation, something would happen, but we had absolutely no guarantee[.]" N.T., 4/1/22, at 17. Attorney Noga testified that the Commonwealth did not extend a plea offer until after Appellant's trial. *Id.* at 14-15, 16-17. Attorney Noga repeated, "there was absolutely nothing communicated prior to [Appellant's] trial." *Id.* at 17. The trial court denied the post-sentence motions on May 10, 2022.

Appellant filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) statement. After concluding it had addressed the matters raised in Appellant's concise statement when it denied post-sentence motions, the trial court stated it "relies upon its Opinion dated May 10, 2022." Statement of the Court Issued Pursuant to Rule 1925, 6/22/22 (attaching 5/10/22 opinion).

**ISSUES**

Appellant presents three issues for review:

- 5 -

1.  W[ere] [Appellant's] due process rights violated when the Prosecution withheld specifics of a plea bargain until after Trial and then recommended a sentence so lenient as to significantly affect the credibility of their key witness and the integrity of the Trial?

2.  Was [Appellant] prejudiced by the Commonwealth[] Attorney['s] representation to the Jury that the Co-Defendant/Cooperating Witness would only receive consideration if he testified **TRUTHFULLY** when following the Trial the Co-Defendant received great consideration despite multiple falsehoods that contradicted the Commonwealth's own evidence, witnesses, including Police Officers?

3.  Did the Lower Court err in determining that the verdict was not against the weight of the evidence?

Appellant's Brief at 6 (bold and capitalization in original).

### *Brady Claim*

Appellant's first two issues are related. Like Appellant, we address the issues together. *See* Appellant's Brief at 15-19.

Citing ***Brady v. Maryland***, 373 U.S. 83 (1963), Appellant argues the Commonwealth violated his right to due process. In ***Brady****,* the United States Supreme Court declared that due process is offended when the prosecution withholds evidence favorable to the defense. *Id.* at 87. Appellant claims the Commonwealth violated his right to due process "by suppressing additional information regarding what 'consideration' the Prosecution's key witness [] Akamichi was going to be receiving for his testimony." Appellant's Brief at 17. Appellant states that Akamichi "denied there were any promises or even a thought of consideration." *Id.* He contends Akamichi "did not testify truthfully yet still received an offer that the Defense was unaware of, and as far as

Counsel knows, has never been proffered in Westmoreland County involving someone who has admitted to being an accomplice to murder." *Id.* at 17-18. Upon careful review, we agree with the Commonwealth that the record contradicts Appellant's claim. *See* Commonwealth Brief at 23.

The Pennsylvania Supreme Court has explained,

> *Brady* and subsequent precedent flowing therefrom imposes upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused. This Court has held that, to establish a *Brady* violation, a defendant has the burden to prove that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the prosecution has suppressed the evidence, either willfully or inadvertently; and (3) the evidence was material, meaning that prejudice must have ensued.

*Commonwealth v. Bagnall*, 235 A.3d 1075, 1085–86 (Pa. 2020) (citations omitted.

Any evidence of an understanding or promise regarding a witness's testimony is relevant and the jury is entitled to that knowledge. *Commonwealth v. Strong*, 761 A.2d 1167, 1172 (Pa. 2000). Due process requires that any potential understanding between the prosecution and a witness be revealed to the jury. *Id.* (emphasis added).

An *en banc* panel of this Court summarized:

> Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Any implication, promise or understanding that the government would extend leniency in exchange for a witness's testimony is relevant to the witness's credibility. *See Giglio v. United States*, 405 U.S. 150, 154, 92

S.Ct. 763, 31 L.Ed.2d 104 (1972). When **the failure of the prosecution** to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. ***See United States v. Bagley***, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

***Com. v. Burkhardt***, 833 A.2d 233, 241 (Pa. Super. 2003) (*en banc*) (emphasis added).

Appellant emphasizes Akamichi's "untruthful testimony." Appellant's Brief at 15; ***see generally id.*** at 15-19. Akamichi was one of numerous Commonwealth witnesses at Appellant's trial. When the Commonwealth called Akamichi to testify, the prosecutor observed: "Present in the courtroom as well is [Akamichi's] attorney, Kenneth Noga." N.T., 6/2/21, at 83. Akamichi testified that he understood his Fifth Amendment right to remain silent. ***Id.*** at 84-85. When the prosecutor asked Akamichi whether he wanted to testify, Akamichi answered: "Yes, sir." ***Id.*** at 85. Akamichi acknowledged he was charged with "the same [murder, conspiracy and abuse of corpse] crimes associated with [the Victim]." ***Id.*** at 84.

Akamichi confirmed that Appellant was his friend, and the Victim was his ex-girlfriend. ***Id.*** at 86-87. Akamichi explained that he was at a gas station with Appellant and Zastawniak when they saw the Victim. ***Id.*** at 89. Later that day, Akamichi drove Appellant and Zastawniak to the Victim's house. ***Id.*** at 90-91. According to Akamichi, Appellant told Zastawniak during the drive that Appellant was going to steal the Victim's gun. ***Id.*** at 91. Akamichi stated that upon arriving at the Victim's house, the three men and

the Victim "started drinking." *Id.* at 92. According to Akamichi, Appellant "got pills off of" the Victim, and Appellant and the Victim "were snorting pills." *Id.* at 93.

The next morning, Akamichi drove Zastawniak to Greensburg, accompanied by Appellant and the Victim. *Id.* at 97-98. Later that day, Akamichi, Appellant and the Victim returned to the Victim's house. *Id.* at 104. They left to go to Walmart and the liquor store, but returned to the Victim's house. *Id.* at 105-08. Next, they went to the Hillview Tavern, where Appellant told Akamichi "he had to tell me something." *Id.* at 112. Akamichi testified that Appellant said "he was going to kill" the Victim. *Id.* The three then drove to a wooded area which Akamichi described as a "hangout spot." *Id.* at 117. As they were walking into the woods, Appellant started striking the Victim with a hammer. *Id.* at 118. Akamichi described the killing consistent with the trial court's recitation. *See* Trial Court Opinion, 5/10/22, at 7-8; *see also* N.T., 6/2/21, at 118-38.

On cross-examination, Akamichi testified to meeting with the prosecutor the week prior to trial to discuss his testimony. *Id.* at 153. Appellant's counsel asked Akamichi:

> Q. Do you remember, after [police] questioned you further, saying well, if I tell you, what's in it for me? Do you remember that?
>
> A. No, sir.
>
> Q. You don't remember?

A.      I don't remember ever saying that.

*Id.* at 155.

Also on cross examination, Appellant's counsel questioned Akamichi about his role as a defendant in an unrelated criminal case. Akamichi answered that he had entered a plea to three felony drug charges and was sentenced to 6 to 23 months' incarceration. N.T., 6/3/21, at 209-10. Appellant's counsel asked Akamichi:

Q.      [D]id the District Attorney's office offer you anything to plead guilty to those charges?

A.      No, sir.

*Id.* at 209.

Akamichi testified that he was released after serving 6 months of his sentence for the drug changes. *Id.* at 210. He further stated, "I'm [currently] incarcerated, sir." *Id.* at 211. Akamichi confirmed he had been advised multiple times, by police and prosecutors, of his constitutional right to remain silent. *Id.* at 212-14.

Throughout questioning — on direct and cross — Akamichi frequently stated he did not remember or did not understand the question. However, his answers to questions about testifying for the Commonwealth were clear. For example, in response to questioning by Appellant's counsel:

Q.      [W]ere you promised anything  -- [s]ince you're charged with murder and conspiracy of murder and abuse of a corpse, were you promised anything from the Commonwealth for your testimony here and your cooperation in the case?

A.   No, sir.

…

Q.   Were you promised anything by the government, by the Commonwealth, for your cooperation in the case and your testimony as to these charges?

A.   No, sir.

Q.   Did they say anything?  They would let the judge know or something like that?

A.   No, sir.

Q.   So you have no idea what's going to happen?  You could face the same punishment as [Appellant] on these homicide charges?

A.   Yes, sir.

N.T., 6/3/21, at 251-52.

On redirect, the Commonwealth asked Akamichi:

Q.   You've not been offered any plea agreements or any recommendation to testify here today; is that correct?

A.   Yes, sir.

Q.   You would agree with me that **I've indicated to you if you appear in court and testified truthfully, that I would show you consideration in your case in the future**?

A.   **Yes, sir**.

Q.   **You would agree with that**?

A.   **Yes, sir**.

Q.   And that is something that I stated to you previously?

A.   Yes, sir.

*Id.* at 253 (emphasis added).

Based on this testimony, the trial court explained:

Regarding [Appellant's] allegations of a failure of due process and an incomplete disclosure of an agreement between the Commonwealth and Akamichi, the evidence presented at trial disclosed that Akamichi had been arrested for three felony counts of possession with intent to deliver … and had entered a negotiated plea agreement to these charges on June 27, 2017, for which he received a sentence of incarceration for 6 to 23 months. The evidence at trial further showed that Akamichi was arrested and charged with murder on March 29, 2018. Further, Akamichi testified at [Appellant's] trial that he was not offered anything by the government in exchange for his testimony. The attorney for the Commonwealth clarified Akamichi's testimony and pointed out that there was an understanding that the Commonwealth would show Akamichi consideration in a sentencing recommendation should he appear in court and testify truthfully. The jury, thus, in fact was presented with evidence that Akamichi's testimony was motivated, in part, by his hope or expectation of leniency from the government.

Trial Court Opinion, 5/10/22, at 15-16 (citations to notes of testimony and footnotes omitted).

The trial court further observed:

Additional evidence was presented at the evidentiary hearing [on Appellant's] post sentence motions. At that hearing, Kenneth Noga, Esquire, Akamichi's defense counsel, testified that he and Brian Aston, Esquire, represented Akamichi in the marijuana case. During the course of that representation, counsel became aware that Akamichi was under investigation for homicide. On March 29, 2018, Akamichi, with counsel, met with detectives to give a statement regarding the [V]ictim's death. The next day, Akamichi was incarcerated and charged with Homicide.

[Attorney] Noga was present when Akamichi testified at [Appellant's] preliminary hearing, when he testified at [Appellant's] trial, and when he met with the Commonwealth to prepare for trial. [Attorney] Noga testified that no plea offer was extended to Akamichi until after [Appellant's] trial had concluded

- 12 -

…. [Attorney] Noga further testified: "I made it very clear to Mr. Akamichi that there was not going to be any offer until after [Appellant's] charges were resolved, and that was my understanding of the district attorney's policy at that time.... So in all honesty, we were hedging a little bit. We had no idea what anybody was going to offer." [Attorney] Noga also testified, "We were hoping that, due to his cooperation, something would happen, but we had absolutely no guarantee about what any kind of offer was going to be — and that he had to rely on that fact — that really, the hope that there would be some consideration given for his cooperation. But there was absolutely nothing communicated prior to the trial." In his testimony, [Attorney] Noga was clear and certain that there was no specific offer of leniency in exchange for testimony extended to Akamichi prior to [Appellant's] trial.

*Id.* at 16-17 (citations to notes of testimony and footnote omitted).

The trial court found the jury was "fully and completely apprised of the extent of the understanding between Akamichi and the Commonwealth … and that no further or more specific offer had been extended[.]" *Id.* at 17. The record and case law support the court's conclusion that "***Brady*** requires no more from the Commonwealth than what was afforded [Appellant] in this case." ***Id.***; ***see also Burkhardt***, 833 A.2d at 241 (discussing Commonwealth's responsibility to produce material evidence). Accordingly, Appellant's issues regarding due process and the Commonwealth's consideration of Akamichi's testimony do not merit relief.

## *Weight Claim*

In his third issue, Appellant challenges the weight of the evidence. Appellant maintains the "evidence of [Appellant's] involvement was primarily the information provided by [] Akamichi." Appellant's Brief at 20. Appellant

- 13 -

concedes there was DNA evidence connecting him to the crime scene, but emphasizes evidence that he had "been at the site … on a number of occasions." *Id.* Appellant claims that "[w]ithout [] Akamichi's testimony[,] the mere fact that there was DNA at the scene would not be dispositive of the issue as to whether [Appellant] was involved in the crime." *Id.* at 20-21. This argument is tenuous.

A claim that the verdict was against the weight of the evidence is addressed in the first instance to the discretion of the trial court and should not be granted because of a mere conflict in the testimony or because the judge would have reached a different conclusion. *See Commonwealth v. Stokes*, 78 A.3d 644, 650 (Pa. Super. 2013). A trial court should not overturn a verdict unless it is so contrary to the evidence as to shock one's sense of justice. *See Commonwealth v. Cash*, 137 A.3d 1262, 1270 (Pa. 2016).

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citations and emphasis omitted).

Instantly, the trial court recounted testimony from numerous witnesses, which supported the jury's guilty verdicts. *See* Trial Court Opinion, 5/10/22, at 3-14. The witnesses included Beverly Richardson, the Victim's mother; Tammy Domiano, the Victim's neighbor; Shelby Townsend, who was working

at the Hillview Tavern where she saw the Victim with two men; numerous investigating law enforcement officers; and forensic experts (who testified at length about physical evidence (including, but not limited to DNA), as well as cell phone call, text, and site location records).  ***See id.***

The trial court explained:

> The jury was able to consider defense counsel's arguments and observe the witnesses' demeanor while they testified, weighing each one's credibility.  Further, the jury was able to assess both corroborative and contradictory evidence presented throughout the trial and arrive at verdicts which are supported by the evidence.

Trial Court Opinion, 5/10/22, at 14.

Our review reveals no error or abuse of discretion by the trial court in determining the jury's verdicts were consistent with the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/10/2023

- 15 -